UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| JOHN LEE LAYTON, | ) | 3:10-cv-00443-ECR-WGC |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | **OF U.S. MAGISTRATE JUDGE** |
| | ) | |
| ROBERT BRUCE BANNISTER, | ) | |
| | ) | |
| Defendant. | ) | |

This Report and Recommendation is made to the Honorable Edward C. Reed, Jr., Senior United States District Judge. This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Currently before the court is defendant Robert Bruce Bannister's Motion for Summary Judgment. (Doc. # 43.)[1] Plaintiff John Lee Layton opposed (Doc. # 49) and Defendant has replied (Doc. # 52). After a thorough review, the court recommends Defendant's motion be granted.

**I. BACKGROUND**

At all relevant times, Layton was an inmate in the custody of the Nevada Department of Corrections ("NDOC"). (Pl.'s First Am. Compl. (Doc. # 29) at 5.) The events giving rise to this litigation took place while Layton was housed at the Northern Nevada Correctional Center ("NNCC") in Carson City. (*Id.*) Defendant is the Medical Director of the NDOC. Layton, a *pro se* litigant, bring this action pursuant to 42 U.S.C. § 1983.

---

[1] Refers to the court's docket number.

On screening, the court determined that Layton states a colorable claim for deliberate indifference to a serious medical need under the Eighth Amendment. (Screening Ord. (Doc. # 5) at 4.) Layton alleges Defendant refused to approve cataract removal surgery for his right eye pursuant to a prison policy. (Doc. # 29 at 2.)

Since 2006, Layton has lodged several grievances related to his request for cataract surgery with the NDOC's medical administration. He alleges Defendant denied two of his grievances. (Doc. # 29 at 2, 13.)  He also alleges the NDOC's Utilization Review Panel ("URP"), on which Defendant sits (*see* Doc. # 49, Ex. N), twice denied surgery referrals from medical personnel at the prison. (*See* Doc. # 44, Ex. A-4 at 15, 30.) Layton claims all of the denials, including Defendant's, were based on budgetary concerns and a "one good eye" policy. (Doc. # 5 at 3.) He alleges his visual impairments make ordinary navigation at the prison difficult, that he frequently bumps into other inmates and structures, and that he has suffered numerous bumps and cuts due to his limited vision. (*Id.*) Layton requests declaratory relief, compensatory and punitive damages, and injunctive relief in the form of cataract removal surgery on his right eye.  (Doc. # 29 at 14.)

Defendant now moves for summary judgment, arguing: (1) Layton's overall visual acuity, although adversely impacted by the cataract in his right eye, does not constitute a serious medical need; (2) assuming Layton's cataract constituted as serious medical need, Layton fails to demonstrate Defendant was deliberately indifferent; (3) Defendant is entitled to qualified immunity; and (4) Defendant cannot be sued in his official capacity for damages.

As mentioned above, Layton is proceeding *pro se*. "In civil rights case where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 923 (9th Cir. 1988).

## II. STANDARD OF REVIEW

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

2

1  (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on
2  file, and any affidavits show that there is no genuine issue as to any material fact and that the movant
3  is entitled to judgment as a matter of law." *Id*. (quoting FED. R. CIV. P. 56(c)). Where reasonable minds
4  could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*,
5  477 U.S. at 250.

6        The moving party bears the burden of informing the court of the basis for its motion, together
7  with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,
8  477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only
9  evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for
10  summary judgment. FED. R. CIV. P. 56(c).

11        In evaluating the appropriateness of summary judgment, three steps are necessary: (1)
12  determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of
13  fact, as determined by the documents submitted to the court; and (3) considering that evidence in light
14  of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes
15  over facts that might affect the outcome of the suit under the governing law will properly preclude the
16  entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered.
17  *Id*. at 248.

18        In determining summary judgment, a court applies a burden shifting analysis. "When the party
19  moving for summary judgment would bear the burden of proof at trial, 'it must come forward with
20  evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In
21  such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact
22  on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,
23  480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden
24  of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting
25  evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the
26  nonmoving party failed to make a showing sufficient to establish an element essential to that party's case
27  on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving
28

1  party fails to meet its initial burden, summary judgment must be denied and the court need not consider
2  the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

3  If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish
4  that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475
5  U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not
6  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute
7  be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W.*
8  *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks
9  and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on
10 conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond
11 the assertions and allegations of the pleadings and set forth specific facts by producing competent
12 evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

13 At summary judgment, a court's function is not to weigh the evidence and determine the truth
14 but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the
15 evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor,"
16 if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary
17 judgment may be granted. *Id*. at 249-50, 255 (citations omitted).

### III. DISCUSSION

19 First, the court will conduct a review of Layton's medical history with respect to his vision
20 issues. The court will thereafter evaluate whether Layton's medical condition would be considered
21 serious and, if so, whether Defendant was deliberately indifferent to that condition.

22 **A. Layton's Grievances and Medical Records**

23 On March 27, 2006, Layton notified Defendant of the cataracts in both of his eyes, the near
24 blindness in his right eye, and his difficulties navigating the prison. (Doc. # 49, Ex. B at 46.) He also
25 requested cataract removal surgery. (*Id.*) Defendant responded on April 3, 2006 and advised him to
26 "check with the Medical Department to determine if your vision impairment qualifies for cataract
27 removal under the current guidelines." (Doc. # 49, Ex. C at 47.)

28

4

Thereafter, Layton submitted a kite to the NDOC's medical department and was examined by an optometrist who refused to refer him to the URP for surgery. (Doc. # 49 at 3.) Layton claims the physician refused his request because he still had one "good" eye–his left eye–and, as a result, petitioning the URP would be futile. (Doc. # 29 at 5.)

Layton then commenced the grievance process, where his request for surgery was denied at the informal level (Doc. # 49, Ex. E at 51), the first level (Doc. # 49, Ex. F at 53), and the second level (Doc. # 49, Ex. G at 55). Each denial–including the second-level denial executed by Defendant–advised Layton he had not met the "parameters" or "criteria" for surgery. (Doc. # 49, Ex. H at 56.) Layton, however, was never informed what those criteria actually were. The denials also recommended that he should purchase from the canteen tinted lenses for his glasses to avoid the glare caused by the cataracts until those criteria were met. (*Id.*)

On February 6, 2008, during Layton's yearly physical with Dr. Snider, his right eye was determined to have "cataracts," while his left eye had "20/40" visual acuity. (Doc. # 44, Ex. A-1 at 7.) Dr. Snider also noted Layton "can't read chart" with his right eye. (*Id.*) On June 7, 2008, Layton again corresponded with Defendant and notified him of his visual impairment in his right eye and requested surgery, to which Defendant responded:

> I am responding to your letter dated 6/7/08. Surgery for the removal of cataracts is not an emergency but I do understand your concerns about how it affects your activities. Please be seen again by Medical. They will determine if a request should be submitted to the [URP] for consideration. I will also contact Medical at NSP about your concern.

(Doc. # 44, Ex. A-2 at 10.)

Layton's medical progress notes from June 12, 2008, show the medical department's receipt of Defendant's referral and his request to have Layton's vision checked. (*Id.* at 11.) On June 18, 2008, Layton sent a kite to NDOC medical personnel seeking to schedule an examination with an optometrist. (Doc. # 44, Ex. A-3 at 13.) Four days later, without being examined, he received a response stating Dr. Snider had already prepared and submitted the referral to the URP on June 16, 2008. (*Id.*) On June 24, 2008, the URP disapproved cataract surgery without any explanation. (Doc. # 44, Ex. A-4 at 15.)

5

1    On August 12, 2008, Layton again resorted to the grievance process, where his surgery request was denied at the informal level (Doc. # 49, Ex. O at 74), the first level (Doc. # 49, Ex. P at 78), and the second level (Doc. # 49, Ex. Q at 79). Each denial advised Layton that his cataract had to reach a certain "stage" or "level" of severity before surgery would be approved. (Doc. # 49-1, Ex. R at 1.) Again though, the denials failed to specify what the requisite stage or level of severity actually was.

Layton had an annual physical examination on February 9, 2009. (Doc. # 44, Ex. A-5 at 17.) At that time, the visual acuity in his right eye was noted as "light only" and "Blind 2 cataracts" and his left eye remained at "20/40." (*Id.*) The examining physician also noted "kite for glasses." (*Id.*) Layton's medical progress notes from September 3, 2009, describe his right eye as "blind" and his left eye as "20/30." (Doc. # 44, Ex. A-6 at 20.)

On April 12, 2010, Layton submitted another kite requesting an appointment with an optometrist for new glasses and a referral for cataract removal surgery. (Doc. # 44, Ex. A-7 at 24.) His appointment was scheduled for May 6, 2010, and his medical records indicate he was examined by an unidentified medical practitioner on that day. (*Id.* at 25.) Layton alleges this practitioner was Dr. Jensen, a NDOC optometrist. (Doc. # 49 at 34.) In the Consultant's Report summarizing the examination, the notes indicate "no improvement" and "mature cataract" in Layton's right eye and "20/30" visual acuity and "central cataract" in his left eye. (Doc. # 44, Ex. A-7 at 25.) An optical order for prescription glasses–prescription # 1157600–was also issued that day. (*Id.* at 26.) Layton received the new glasses and a case for them on June 1, 2010. (*Id.* at 27.)

Progress notes from March 5, 2011, show Layton's examining physician referred him for an eye examination on May 28, 2011, and indicate to "please ensure annual cataract rev." (Doc. # 44, Ex. A-9 at 39.) The progress notes entered on March 8, 2011, confirm that request for an eye examination appointment. (*Id.*)

On May 5, 2011, Layton again saw a consultant.[2] (Doc. # 44, Ex. A-8 at 29-30.) Layton alleges the consultant was Dr. Jensen. (Doc. # 49 at 10, 17.) The notes in Dr. Jensen's report indicate "mature

---

[2] Comparing the handwriting and signature on the report from this visit with the handwriting and signature on report from 2010 visit, it appears the same practitioner conducted both examinations.

6

1  cataract" in Layton's right eye and "central dense cataract" that is "mild - moderate" in his left eye. (Doc.
2  # 44, Ex. A-8 at 29.) However, even with the apparent onset of a cataract in his left eye, the visual acuity
3  of Layton's left eye is noted as "20/40 + 2 - 20/30 – 2." (*Id.*)

4        On June 2, 2011, Layton was referred to the URP for consideration of removal of the cataract
5  in his right eye. (Doc. # 44, Ex. A-8 at 30.) Layton alleges he did not ask for this referral but that Deputy
6  Director Donald Helling referred him anyway. (Doc. # 49 at 11.) Handwritten notes on the top of the
7  referral page refer to Layton's examination on May 5, 2011. (*Id.*) On June 14, 2011, the URP denied the
8  referral, stating: "does not meet criteria, follow up annually . . . opthal." (*Id.*) As before, the criteria
9  Layton failed to satisfy were neither enumerated nor explained to him.

10 **B. Analysis**

11       ***1. Eighth Amendment: Deliberate Indifference to a Serious Medical Need***

12       *a. Layton's Serious Medical Need*

13       Defendant moves for summary judgment on the basis that Layton's cataract does not constitute
14 a serious medical need because it causes no pain, it can be removed at any time, and it does not lead to
15 permanent vision loss. (Doc. # 43 at 11.) Further, Defendant argues Layton's own description of his
16 routine day-to-day activities (personal hygiene tasks and performing chores) belie the seriousness of his
17 medical condition. (*Id.*) The various bumps and cuts Layton alleges are unsupported by any credible
18 documentation and, Defendant contends, likely could have been caused by a number of other ailments
19 from which Layton suffers. (*Id.* at 11-12.)

20       Conversely, Layton alleges the cataract in his right eye has limited his vision and his ability to
21 safely perform routine tasks of daily living, such as: showering, walking through the prison halls without
22 bumping into people or structures, jogging outside, reading, watching television, and other recreational
23 activities. (Doc. # 29 at 7-8.) Despite the relatively high visual acuity of 20/30 or 20/40 in his left eye,
24 he contends surgical removal of the right eye's cataract would eliminate many of these limitations. (*Id.*
25 at 3.)

26       A prisoner can establish an Eighth Amendment violation arising from deficient medical care if
27 he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v.*

28 7

1  *Gamble*, 429 U.S. 97, 104 (1976). A finding of deliberate indifference involves the examination of two
2  elements: "the seriousness of the prisoner's medical need and the nature of the defendant's responses
3  to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds by WMX*
4  *Tech., Inc. v. Miller*, 104 F.3d. 1133 (9th Cir. 1997).

5         "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in
6  further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id*. (quoting *Estelle*, 429
7  U.S. at 104). Examples of conditions that are "serious" in nature include "an injury that a reasonable
8  doctor or patient would find important and worthy of comment or treatment; the presence of a medical
9  condition that significantly affects an individual's daily activities; or the existence of chronic and
10  substantial pain." *Id*. at 1059-60.

11         Here, Layton's medical records show he received two referrals to the URP for surgery–one from
12  Dr. Snider in 2008 and another from an optometry consultant in 2011–both of which were denied.
13  Dr. Snider's referral appears to have been a perfunctory referral submitted pursuant to Defendant's
14  request without any further examination of Layton. This referral, therefore, appears to have no obvious
15  clinical basis and, as a result, it is not particularly probative to the seriousness of Layton's medical need.

16         Conversely, the consultant's referral in 2011 followed an examination and a finding of a mature
17  cataract in Layton's right eye. (*See* Doc. # 44, Ex. A-8 at 30.) Although this referral was not explicit in
18  identifying Layton as a candidate for immediate surgery, it noted Layton's mature cataract in his right
19  eye as the reason for the referral. Based on this, the court can reasonably infer the consultant referred
20  Layton for consideration of cataract removal. This inference is further supported by the URP's
21  explanation for its disapproval, namely "does not meet criteria . . . ." (Doc. # 44, Ex. A-8 at 30.)
22  Defendant previously denied Layton's surgery requests on the basis of Layton's failure to meet the
23  criteria *for surgery* under the prison's guidelines; thus, here, the court can infer the URP's explanation
24  in denying the consultant's 2011 referral contemplated surgery, too.

25         Precisely because the consultant's referral for surgery immediately followed an examination, the
26  court finds it is significantly probative to the seriousness of Layton's medical need. Put another way,
27  this referral is evidence of an injury that a reasonable doctor would find important and worthy of
28

comment or treatment. *See McGuckin*, 974 F.2d at 1059-60. In that regard, the consultant examined Layton and determined by written comment and referral to the URP that Layton had a mature cataract in his right eye. (Doc. # 44, Ex. A-8 at 30.) Notwithstanding the opinions of Defendant, the URP, and other NDOC medical personnel about whether Layton's *overall* visual acuity meets the criteria for surgery, Layton's medical records indicate he has no vision in his right eye, and an examining physician believed the cataract causing Layton's blindness was worthy of comment or treatment. Moreover, Layton corroborates these medical findings by noting his inability to see out of his right side in the prison halls. (Doc. # 29 at 7-8.) Also, the examining optometrist's alleged statement in 2006 referring to Layton's one "good" eye (Doc. # 29 at 5) implies the other eye was "bad," or blind. Thus, based on the medical records and the inferences drawn in Layton's favor, the court concludes Layton has demonstrated a serious medical need with the cataract in his right eye.

      *b. Defendant's Deliberate Indifference*

      Defendant claims he and the NDOC's medical personnel who dealt with Layton addressed Layton's concerns and denied Layton's requests for surgery based on medical information collected from various examinations. (Doc. # 43 at 12-13.) According to Defendant, this information showed Layton was a premature candidate for cataract removal surgery because his overall visual acuity still enabled him to perform the required tasks of daily living in the prison. (*Id.* at 13.) Defendant cites to Medical Directive 106 which, according to Defendant's declaration, permits cataract removal surgery if the inmate's "visual impairment is incompatible with the ability to perform the required tasks of daily living in their current living environment." (*Id*. at 20.)[3] Further, Defendant contends the denials of Layton's surgery requests have not caused further injury to his eyes. (Doc. # 52 at 5.) Defendant asserts a cataract does no damage to the eye and it can be removed at any time when overall visual acuity falls to a certain level. (Doc. # 43 (Def.'s Decl.) ¶ 8.) For these reasons, Defendant contends he was not deliberately indifferent to Layton's serious medical need. (*Id*. at 12.)

---

[3] Defendant certifies that true and correct copies of MD 106 are attached to his declaration, but after close review, the court sees no such attachments. Layton, however, attached MD 106 and Medical Directive 809 to his opposition. (*See* Doc. # 49, Exs. M, N.)

1        Conversely, Layton contends Defendant and other NDOC medical personnel have been
2 deliberately indifferent to his need by repeatedly denying him surgery pursuant to a "one good eye"
3 policy (Doc. # 29 at 3) and certain medical directives of which he was unaware until after the URP's
4 second denial (Doc. # 49, Ex. A at 40). Layton also alleges the cataract in his left eye is progressively
5 worsening, and if surgery for his right eye is delayed for too long, his left eye may be blind or nearing
6 blindness by the time surgery is approved, leaving him in a similarly "hazardous predicament . . . ." (*Id.*
7 at 7; *see* Doc. # 49 at 35.) In making this point, Layton alleges an optometrist told him the actual visual
8 acuity of his left eye is actually "20/70" but that his corrected vision with lenses is "20/30" or "20/40."
9 (Doc. # 43 (Pl.'s Dep.) at 99-100.) He also alleges Dr. Jensen explained to him in 2010 that "the U.R.P.
10 would not approve surgery until [Layton's] 'good eye' got so bad that he could no longer function. And
11 N.D.O.C. just didn't have the money for the surgeries." (Doc. # 49 at 35.)

12        If the medical needs are serious, Plaintiff must show that Defendants acted with deliberate
13 indifference to those needs. *Estelle*, 429 U.S. at 104. "Deliberate indifference is a high legal standard."
14 *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more
15 than medical malpractice or even gross negligence. *Id.* Indeed, inadvertence alone is insufficient to
16 establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060.

17        Instead, deliberate indifference is only present when a prison official "knows of and disregards
18 an excessive risk to inmate health or safety; the official must both be aware of the facts which the
19 inference could be drawn that a substantial risk of serious harm exists, and he must also draw the
20 inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see Clement v. Gomez*, 298 F.3d 898, 904 (9th
21 Cir. 2002) (same).

22        "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they
23 deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior
24 physician for reasons unrelated to the medical needs of the prisoner. *Hunt v. Dental Dep't.*, 865 F.2d
25 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving
26 medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*,
27 974 F.2d at 1060; *see Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)
28

(per curiam) (delay in treatment must lead to further injury to support a claim of deliberate indifference).

In addition, a prison physician is not deliberately indifferent to an inmate's serious medical need when the physician prescribes a different method of treatment than that requested by the inmate. *See McGuckin*, 974 F.2d at 1059 (explaining negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights). A difference of opinion concerning appropriate medical care–either between a physician and the prisoner, or between medical professionals–does not amount to deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *see Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (difference of opinion between a prisoner-patient and medical staff regarding treatment is not cognizable under section 1983). For a difference of opinion to amount to deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Snow*, 681 F.3d at 988 (internal quotations and citation omitted).

"The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060 (quoting *Hudson v. McMillan*, 503 U.S. 1, 6 (1992)). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

In this case, Layton's claim centers on Defendant's and the URP's denials of his requests for cataract removal surgery in his *right* eye. He makes only oblique references to the cataract in his left eye. Defendant, on the other hand, focuses less on Layton's right eye and instead argues Layton's *overall* visual acuity is not sufficiently low to warrant surgery. In making this argument, Defendant implicitly relies on the relatively high visual acuity of Layton's *left* eye.

In determining whether Layton suffers from a serious medical need, the court justifiably focused

11

on the cataract in his right eye because Layton himself did so in his complaint. Moreover, all of his kites, grievances and requests for surgery focus on the removal of that cataract, and the consultant's 2011 referral listed that cataract as a reason for surgery. However, deciding whether Defendant was deliberately indifferent to that serious medical need requires a different analysis.

As mentioned previously, when alleging deliberate indifference as a result of delay in receiving medical treatment, a prisoner must demonstrate the delay led to further injury. *See Shapley*, 766 F.2d at 407. Under this analysis, Layton's overall visual acuity is the appropriate measurement of potential further injury because his right eye could suffer no further injury during the relevant time period–it remained blind the entire time. Consequently, the visual acuity of Layton's *left* eye becomes highly relevant to assessing his overall visual acuity and any further injury thereto.

Layton's medical records between 2008 and 2011 appear to show no deterioration of his overall visual acuity; rather, these records show persistent blindness in his right eye and a consistent visual acuity of 20/30 or 20/40 in his left eye. (Doc. # 44, Ex. A at 7, 29.) In fact, a thorough review of Layton's medical records shows the visual acuity in his left eye never became worse than 20/40 during this time period. (*See* Doc. # 44, Ex. A.) As a consequence, the court finds Layton fails to show Defendant was deliberately indifferent under the "further injury" theory.

Further, it comes as no surprise that Defendant (and the URP) repeatedly used the same reason to justify denying Layton's surgery, namely: Layton's *overall* visual acuity by reason of his "good" left eye allowed him to perform sufficiently the required tasks of daily living. Although neither Defendant nor the URP explained to Layton what the criteria for surgery actually were, Defendant's motion makes clear that Defendant and the URP issued their denials pursuant to Medical Directive 106 ("MD 106"). (*See* Doc. # 43 at 12-13.) MD 106 is titled "Cataracts." The 2008 version reads:

> It is the policy of the Department that inmates with cataracts will be evaluated on a case by case basis, taking into consideration their ability to function within their current living environment. . . . Patients with visual impairment incompatible with the ability to perform the required tasks of daily living in their current living environment may be considered for removal of a cataract.

(Doc. # 49, Ex. M.) The court finds Defendant's decisions to deny surgery under these criteria did not constitute deliberate indifference because the decisions are supported by Layton's medical records,

which show he was found never to have a "functional limitation/disability" due to his eye condition, and the relatively high visual acuity in his "good" left eye. (*See* Doc. # 44, Ex. A at 7, 29.) Stated differently, Layton's medical records belie any claim that Defendant's denials under the guidelines of MD 106 constituted a knowing disregard of an excessive risk to Layton's health or safety. *See Farmer*, 511 U.S. at 837.

Additionally, Medical Directive 809 ("MD 809") is titled "Utilization Review" and it governs the URP's decision-making process. (*See* Doc. # 49, Ex. N.) The 2008 version of MD 809 places cataracts in a "Level 3-Medically acceptable-not always necessary" category of care, which is described as the following: "Medical conditions that do not significantly interfere with the inmate's ability to function in their current living situation." (*Id.*) The absence of a "functional limitation/disability" due to Layton's eye condition is aligned with this directive as well. Thus, the court finds the URP's decisions to deny surgery under these criteria are also supported by the record and, consequently, do not constitute deliberate indifference. *See Farmer*, 511 U.S. at 837.

Finally, as this court found in *Colwell v. Bannister*, No. 3:10–cv–00669–LRH–WGC, 2012 WL 961227, at *6 (D. Nev. Feb. 13, 2012),[4] Defendant's decision to deny Layton's request for cataract surgery on the grounds that Layton's condition did not meet the prison's medical criteria amounts to a difference of opinion regarding the appropriate course of treatment. *See Sanchez*, 891 F.2d at 242. The court notes that the *Colwell* case was decided before the Ninth Circuit Court of Appeals decided *Snow*, *supra*. The *Snow* case held that although a difference of opinion clearly existed between medical professionals, factual issues remained that precluded entry of summary judgment regarding whether the chosen course of treatment was medically unacceptable under the circumstances. *Snow*, 681 F.3d at 988. *Snow*, however, is easily distinguishable from the instant case.

*Snow* involved repeated denials of hip replacement surgery by prison medical personnel who did

---

[4] The *Colwell* case involved a nearly identical factual scenario where prison medical staff, including Dr. Bannister and the URP, delayed or denied the inmate's request for cataract surgery, which was recommended by an optometrist. *Colwell*, 2012 WL 961227, at *5-6. U.S. District Judge Larry R. Hicks approved and accepted the court's Report and Recommendation granting summary judgment in favor of the defendants based on the inmate's failure to establish deliberate indifference. *See Colwell v. Bannister*, No. 3:10–cv–00669–LRH–WGC, 2012 WL 965973 (D. Nev. Mar. 21, 2012).

13

not examine the inmate, even though the consistent recommendation by two outside orthopedic specialists (and one NDOC physician) over the course of three years was that the inmate needed "emergency" and "urgent" hip replacement surgery to alleviate his severe pain and immobility issues. *Id*. at 983-84. The inmate could neither kneel nor walk more than a few feet unsupported, and he had extreme difficulty getting his socks and his pants on. *Id.* at 984. One physician even found the inmate's condition "potentially life threatening." *Id.* Rather than approve the surgery, prison officials resorted to painkillers, steroids and narcotics for the inmate's pain, all of which may have harmed his kidneys while also failing to alleviate his significant mobility issues. *Id.* at 987, 988. The Ninth Circuit reversed the district court's decision granting summary judgment in defendants' favor. *Id*. at 988. The court concluded factual issues precluded summary judgment and that a reasonable jury could find the denials for surgery, and the alternative course of treatment with medication, were medically unacceptable under all of these circumstances. *Id*.

Here, unlike *Snow*, none of Layton's treating physicians recommended immediate surgery, let alone "emergency" or "urgent" surgery. Nor did any of these physicians label Layton's medical condition "potentially life threatening." Unlike the inmate in *Snow*, Layton admitted during his deposition that he is able to perform routine tasks of daily living without much incident, including dressing himself, personal hygiene tasks, making coffee every morning, attending meals in the dining area, walking outside in the yard, occasionally lifting weights, and participating in a senior structured living program, which involves Layton mopping the bathroom floor once or twice a week. (Doc. # 43 at 61-75.) Layton also stated he worked in the law library doing copy work and law clerk duties from 2001 to 2011. (*Id.* at 73.) Further, unlike *Snow*, the record contains no indication that the medical department's chosen course of treatment for Layton worsened his condition, or failed to prevent significant additional injury to him. As mentioned previously, Layton's overall visual acuity saw little to no change over the course of the relevant time period.[5]

---

[5] The court is mindful of at least one other decision out from this District, *White v. Snider*, No. 3:08-cv-252-RCJ-VPC, 2010 WL 331742 (D. Nev. Jan. 26, 2010), that has concluded differently on similar facts. However, the key factual difference between the *White* case and the instant case is that the vision of the plaintiff in *White* became progressively worse over the relevant time period–from 20/100 in March of 2006 to 20/400 in March of 2007–as a result of defendants' denial

Defendant and the URP determined that surgery was not an appropriate course of treatment. This decision differs from Layton's opinion and appears to differ from one of Layton's treating physicians. Although neither Defendant nor the members of the URP appear to have examined Layton, the court finds the decisions to deny surgery constituted a difference of opinion and were not medically unacceptable under all of the circumstances, which include Layton's ability to perform daily tasks and the absence of any conclusive evidence that Layton's condition called for "immediate," "emergency," or "urgent" surgery. Furthermore, the court finds Layton fails to demonstrate that the denial of right eye cataract surgery was made in conscious disregard of an *excessive risk* to his health. The facts presented show Layton continues to live under no such risk. Consequently, the court finds Defendant was not deliberately indifferent to Layton's serious medical need.

The court sympathizes with Layton's plight. It is unfortunate that the NDOC cannot provide him with the surgical treatment he has requested–treatment which appears to be appropriate herein. Although the court is aware that "[b]udgetary constraints . . . do not justify cruel and unusual punishment," *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986), the court assumes Defendant, if not constrained by budgetary issues, would similarly prefer to have Layton's cataract treated. But under the standards attendant to an Eighth Amendment claim, the suppression of those preferences even for budgetary reasons does not equate to deliberate indifference, particularly where, as here, alternative medical explanations for the refusal are present.[6]

Accordingly, the court recommends summary judgment should be granted in Defendant's favor on Layton's Eighth Amendment claim. Because of this conclusion, the court need not evaluate Defendant's arguments regarding qualified immunity or official capacity damages.

/ / /

/ / /

---

or delay of cataract removal surgery. *White*, 2010 WL 331742 at *2.

[6] The court is concerned, however, about the apparent progression of the cataract in Layton's "good" (left) eye. If Layton's visual acuity in his left eye deteriorates much further, the court assumes NDOC will move expeditiously to provide him the appropriate medical treatment he would seemingly require to restore his vision.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING** Defendant's Motion for Summary Judgment (Doc. # 43).

The parties should be aware of the following:

1. They may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED: September 28, 2012.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE